S. S. WHITE DENTAL MFG. CO. v. DELAWARE INS. CO. OF PHILADELPHIA.

(District Court, E. D. Pennsylvania. December 31, 1900.)

No. 68.

MARINE INSURANCE—CONTRACT—MODIFICATION BY COURSE OF DEALING.

Libelant exported large quantities of dental goods of its manufacture, and for more than 30 years carried an open marine cargo policy issued by respondent, renewed from time to time, under which it insured all its shipments, except where its consignees had insurance. The policy provided that no risk should attach until approved and indorsed thereon by respondent, the premium to be then agreed on; but by a course of dealing between the parties, extending over many years, and adopted for mutual convenience, owing to the large increase in libelant's foreign business, no indorsements were made on the policy, nor was each risk approved before it attached thereunder, but was reported by libelant on receipt of the bill of lading on a slip furnished by respondent for the purpose, and respondent entered on each slip the rate and amount of premium in accordance with a schedule agreed upon between the parties, and at the end of each month transcribed the entries thereon into a pass book, which it also furnished libelant, and indorsed its approval thereon. It resulted from this method that respondent usually did not receive notice of a shipment until after the vessel had sailed, and frequently not until it had reached port; but the risks were treated as covered by the policy from the date of shipment. Respondent did not notify libelant of the acceptance of risks, but it had never rejected a risk because of any objection thereto. June 30, 1898, libelant shipped a consignment of goods from New York on La Bourgogne, a vessel of a line by which it had frequently shipped, which vessel was sunk in collision on July 4th. Libelant received the bill of lading July 5th, and on the morning of the 6th, and before notice of the loss, sent the usual slip stating such shipment to respondent. The loss became known before the slip was received by respondent, and after some delay it rejected the risk. Held, that the course of dealing pursued by the parties under the policy for so many years oper-

ated to abrogate and supersede its written provision requiring each risk to be approved before it attached, and bound respondent to accept the risk in controversy, which was within the requirements of the policy in respect to the kind of goods, character of the vessel, and port of destination, and in all respects similar to others which had uniformly been accepted.

In Admiralty. Action on policy of marine insurance.

Jos. C. Fraley, Henry N. Paul, and Richard C. Dale, for libelant.

Edward S. Sayres and John G. Johnson, for respondent.

J. B. McPHERSON, District Judge. There is not much dispute concerning the material facts of this case, and the following findings, although taken largely from the argument of libelant's counsel, are, therefore, in the main, either admitted or not denied by the respondent. Where a controversy exists, I have not always been able to adopt the libelant's view.

### Facts.

(1) The S. S. White Dental Manufacturing Company is a Pennsylvania corporation, engaged in the manufacture and sale of dental instruments and supplies. Its business was founded by S. S. White, in Philadelphia, many years ago, where it has been conducted continuously ever since. The Delaware Insurance Company of Philadelphia is also a Pennsylvania corporation, authorized to make marine insurance, and having its office in Philadelphia.

(2) The libelant exports to foreign countries large quantities of dental goods of its own manufacture. All such foreign shipments (with the exception about to be noted) for over 30 years have been insured with the respondent, the insurance having been effected under a policy that was in force prior to 1867, and has been continuously renewed since that time. The last renewal was on January 1, 1895. The only exception from this insurance was the goods of certain customers, who, having their own open policies, instructed the libelant not to insure shipments to them; and of this exception the respondent had notice.

(3) The policy referred to was an ordinary marine cargo printed form. With some slight variance of phrase in the different renewals, it insured the libelant on "goods for account of whom it may concern per vessel or vessels and/or usual conveyances, * * * lost or not lost, at and from ports or places of loading to ports or places of destination." It contained the following written clauses: "No risk to attach to the policy until the amount and description of the same shall be approved and indorsed thereon by the company, and to be valued at the sum so indorsed." "Premiums as may be agreed upon at the time of indorsement, and to be settled monthly in cash."

(4) Libelant's business has increased greatly since the writing of the original policy by the respondent. For some time the amount insured under this policy has regularly exceeded a quarter of a million dollars each year, and the number of individual insurances has likewise increased. For example, during the month of July, 1897, seventy-one separate shipments were insured, an average of nearly three for each working day.

(5) Libelant's foreign forwarding was done through Healy & Earle, shipping brokers, of New York. The name of the vessel by which any particular shipment had gone forward was not known to libelant until the receipt from Healy & Earle of advices by mail containing the bill of lading. These were usually not received until after the vessel had left port. All of libelant's forwarding was done by vessels of regular lines, concerning whose seaworthiness no question was likely to arise. So far as appears, no risk reported by the libelant had ever required consideration, or been referred to one of the executive officers of the respondent.

(6) With the increasing volume of business transacted under this policy, and perhaps in recognition of the changed requirements of the business, there were established the following departures from what was no doubt originally contemplated when the written clauses of the policy were framed, over 30 years before:

(a) Instead of providing a place on the policy itself for indorsements, the respondent printed blank books (called "pass books") bearing on the cover in gilt letters:

"The S. S. White Dental Manufacturing Co.
"Open Policy with
The Delaware Ins. Co. of Philadelphia."

These pass books were ruled into columns headed as follows: "Date," "Name of Vessel," "Place of Shipment," "Place of Destination," "Description of Goods and for Whose Account Insured," "Amount to be Insured," "Rate of Premium," "Amount of Premium," "Date of Approval," "Signature." At first the policy was folded, and pasted opposite the inside of the front cover of the current pass book; and, a few pages further on, the following indorsement was printed: "It is hereby agreed that all approved indorsements on this book are to apply in all respects to policy No. ——— the same as if indorsed on said policy, and not otherwise." Afterwards the policy was left pasted in one of the old books filled with indorsements, and new pass books were issued without any policy being attached thereto.

(b) Instead of premiums "as may be agreed upon at the time of indorsement," the parties specially agreed by written schedules upon certain fixed rates to all points to which libelant made shipments. The last of such agreements is embodied in a letter from the respondent, dated November 8, 1897. Inter alia, this fixed the rates to European ports at one-fourth, net.

(c) Instead of requiring libelant to fill in a description in the first column of the pass book for each risk to be insured, and then immediately to bring the book to the insurance office for indorsement of the premium and approval, the respondent furnished the libelant with blank insurance orders (called in the record "slips"), made up into pads. The blank form of the slip is as follows:

Philadelphia, ———, 18—.

The Delaware Insurance Company of Philadelphia

Insure, under open policy No. ———, $———, on ———, valued at $———, per ———, at and from ——— to ———.
$——— at ———%, $ ———.

(d) Libelant could not, and did not attempt to, fill out these slips until after receipt of information from New York which enabled it to fill in the name of the vessel. The slips, thus filled in, were sent to the respondent at intervals, often in batches of a half dozen or more, and usually through the mail. By the time these slips reached the respondent, the vessels containing the shipments reported had usually been at sea some days. Not infrequently the vessel had arrived at its destination, and this arrival had been published in the shipping news of the New York Herald before the slips reached the respondent. Premium was charged by the respondent and paid by libelant on almost all risks at the full stipulated rate, irrespective either of the diminution of the premium at the time of the report to the respondent by reason of the vessel having sailed some days previously, or of the expiration of the risk by reason of the vessel having previously arrived at its port of destination. On two occasions,—one in 1886 and one in 1888,—when the respondent learned that it had been requested to insure after the ship had actually arrived, it notified the libelant of this fact, and refused to charge any premium.

(e) Instead of immediately entering in the pass books the amount and the description of each risk notified to the respondent as given in the slips, and filling in the columns for the rate and amount of premium, the marine clerk of the respondent to whom the approval of its marine risks was usually intrusted indorsed on each slip, when it was received from libelant, the rate and amount of premium in accordance with the stipulated rate, and laid the slip inside a box on his desk.

(f) Instead of indorsing approval of the risks on the pass book, the respondent regularly omitted making any indorsement for several weeks at a time. Both the respondent and the libelant used the pass book rather as a bill than as a policy.

At the end of each month, or perhaps a week or two later, the respondent sent to the libelant's office to obtain the pass book. The marine clerk of the respondent then transcribed in the pass book from the slips in his possession the amount, description, and premium for all of the risks contained on the slips that had been received during the preceding weeks. This transcription occupied the first eight of the columns of the pass book. The column headed "Date of Approval" was then filled in by an assumed date, and the signature column was signed once on each page by the marine clerk, with a bracket to indicate that the signature applied to all the risks on the page.

The marine clerk always made these assumed dates of approval correspond to the dates of the respective slips. His alternate clerk dated the approval according to the actual date of entry in the book. Upon payment, the premium column was receipted by the respondent, the book was returned to the libelant, and was not sent for until the end of the next month.

(g) For at least the past 10 years the libelant, under this changed system of business, reported to the respondent on slips every foreign

shipment sent by them, except the shipments ·to such customers as carried their own insurance. The respondent charged and received full premium on nearly all these risks, whether reported before oɪ after the arrival of the vessel. There is no evidence that any risk reported by the libelant had ever been objected to.

(h) No notice of the acceptance or approval of any of the risks reported upon the slips that were thus sent by the libelant to the respondent was ever given to the libelant, but, if any risk had been disapproved, notice of disapproval would have been given at once to the libelant.

(7) In addition to the above course of dealing, which was fully known to both parties, the following course of business was adopted by the respondent concerning these risks, the facts of which were not known by the libelant:

(a) In July, 1895, the respondent entered into a contract of reinsurance with the British & Foreign Marine Insurance Company. By this contract, for a consideration equal to the net cash premiums received by the Delaware Company, less a bonus of 5 per cent., the reinsuring company took upon themselves "all risks accepted by the Delaware Insurance Company of Philadelphia at their Philadelphia office on merchandise and/or cargoes only." The policy contained this clause: "Warranted by the reinsuring company that all risks attaching hereunder are to be reported to Mather & Company, attorneys for this company, as soon as known to the reinsured." From time to time the respondent filled out printed returns to Mather & Co., agents for the reinsuring company, these returns consisting of a transcript of the entries upon the slips. It was the duty of the marine clerk of respondent to make this transcription from the slips to the return sheets for the reinsuring company, and upon making the entries upon the return sheets the clerk placed a tick mark in the upper left-hand corner of each slip thus transcribed. ᵔSince the existence of the contract of reinsurance the respondent has given less attention to its marine insurance business. It ceased to have a special secretary in charge of this branch, and left the matter largely to the marine clerk and his alternate.

(b) The respondent also had a large office book, ruled into columns, called the "Open Policy Book." This was a ledger for the transcription of the risks reported to them under the open policies that had been issued to their customers.

For at least several years past the risks reported by the libelant (being all described, with computation of premium, upon the slips) were not transcribed or entered up in the open policy book as the slips were received, nor until several days later, as might be convenient. Often no entry of the risks reported· by the libelant was made in the open policy book until the end of the month, when this book was written up in the same manner as the pass book was written up.

(8) On June 30, 1898, the libelant shipped certain dental goods belonging to it, of the asserted value of $17,108.42, on the steamship La Bourgogne, then lying in the port of New York, and bound for

Havre, France. On the morning of July 4th the steamship was sunk with her whole cargo, and became a total loss by perils of the sea, off the Banks of Newfoundland, in the Atlantic Ocean. The news of the disaster was not known in Philadelphia until shortly before noon on July 6th. La Bourgogne was one of the regular steamers of the French Transatlantic Line sailing from New York every Saturday. Libelant's shipments were often forwarded by this line.

(9) Libelant's agents, Healy & Earle, who attended to this shipment, forwarded the bill of lading to libelant's office in Philadelphia by mail on July 1st; but, July 2d being a half holiday, July 3d being Sunday, and July 4th a legal holiday, the letter of Healy & Earle and the bill of lading were not received at libelant's Philadelphia office until Tuesday, the 5th day of July. On the morning of July 6th the clerk of libelant, whose duty it was, proceeded to fill out slips in order to report to the respondent all shipments which had been communicated to the libelant, but had not been previously reported. He began his work shortly after 10 o'clock, and in about a quarter of an hour had filled up eight of these slips, one of them relating to the shipment by La Bourgogne. A copy of this slip is as follows:

Philadelphia, 7/6, 1898.

The Delaware Insurance Company of Philadelphia

Insure, under open policy No. ———, $17,108, on Mdse., valued at $———, per S. S. La Bourgogne, at and from New York to Le Havre, France; thence R. R. to Zurich, Switzerland.

|  | ¼ net | a/c J. M. Ravel. |
| $———, at | % $42.77. | The S. S. W. D. M. Co. |

This slip was filled in by him, and signed with the name of the libelant, in the regular course of business, in ignorance of the disaster to the steamship, and a short time before the news had reached the office either of libelant or respondent. After eight slips were filled, he placed them on the desk of another clerk for mailing. They were forwarded by mail that morning, and reached the office of the respondent about 2 o'clock. The news of the disaster had been learned by the respondent about 12 o'clock that morning.

The envelope containing the eight slips from libelant was opened at respondent's office by the vice president, who, after reading them, handed them to the marine clerk, who thereupon took the slips, and inserted in each of them the rate and the premium, charged in the usual way in the place provided for this entry. Ordinarily, the marine clerk had full power to accept or decline marine risks. It was his custom to consult with one of the executive officers concerning risks that he considered doubtful.

(10) Shortly afterwards he had a talk with the vice president of the respondent about this risk, and upon his advice went over to see Mather & Co., the agents of the reinsurers, whose office was across the street. They advised rejection of the risk. Later in the afternoon, after consulting with the vice president, the marine clerk filled out the report of accepted risks to the reinsuring company that is printed on pages 50 and 51 of the notes of testimony. This report or return included all of libelant's risks that had been reported to

respondent during the last seven days, and the first line of entry related to the libelant's shipment on La Bourgogne, on the slip for which he made the customary tick mark in the upper left-hand corner. This return reached Mather & Co. the next day. They, immediately sent it back to the respondent, who crossed out the first line of entry, and returned it to Mather & Co. in this condition. Mather & Co. again declined to receive the paper, and a return was finally made on which the shipment in question did not in any way appear.

(11) To a clerk of libelant, who called at the office of the respondent about 2 o'clock on the afternoon of July 6th, to inquire whether the slip had been duly received, the marine clerk stated that he would telephone that afternoon stating the position of the respondent in the matter. Although the vice president was at the office all afternoon, no message was sent. The next day the president of the respondent wrote, refusing to admit liability for the loss.

(12) Due proofs of loss were furnished to the respondent by libelant, and claim was made for the value of the goods, but payment has been refused by the respondent.

(13) Since December 1, 1894, another policy, called the "in-bound policy," was also in force between libelant and respondent. It applied only to platinum ore, of which libelant imports large quantities. It was limited to imports from European ports, and, being free from particular average, the rate was one-fifth of 1 per cent., instead of one-fourth, as in the outward-bound policy. It was pasted in a pass book similar to those relating to the outward-bound policy, and bore the inscription:

"The S. S. White Dental Manufacturing Co.
"Foreign Open Policy with
The Delaware Ins. Co. of Philada."

This policy contained the following clauses:

"To apply to and cover each and every shipment for account of S. S. White Dental Mfg. Co."
"Notice of each shipment to be given to the Delaware Ins. Co. of Philada. as soon as in receipt of bill of lading or other advice of shipment."

The course of dealing and reporting under this policy was identical with that adopted under the policy in suit. Insurances under it were reported to Mather & Co. on the same slip as risks reported under the policy in suit.

The foregoing facts raise the question, whether the parties had so changed the original contract of insurance upon outward-bound goods that the merchandise in question was protected by the policy, notwithstanding the fact that there had been no formal approval and indorsement of the risk, as the letter of the contract provides. I think that no weight is to be given to the circumstance that, a few months before the date when the last renewal of the outward-bound policy was made, a policy upon inward-bound goods was also issued that contained a different provision concerning the time when the risk should begin. If the outward-bound policy of January 1, 1895, had been the first contract between the parties upon goods leaving this

country, there would be much force in the argument that the two contracts were intended to be of different scope, and that the parties had chosen apt words to express the difference. But when it is considered that the outward-bound policy of January 1, 1895, was not the first contract concerning this class of risks, but was the last contract of a series extending over many years, and that the terms of the last policy are essentially the same as the terms contained in the preceding policies of the series, the conclusion is, to my mind, inevitable that the policy of January 1, 1895, was not intended to make an abrupt break in the course of dealing between the parties, but was merely intended to continue their relations in the same manner, and to the same extent, as had theretofore been established by a long and unbroken custom.

It cannot be denied, I think, that the parties to a written contract may set aside any one or more of its terms, and may thereafter deal with each other as if such terms no longer existed. Being competent to make one contract, they are competent to make another, different from the first; and, if the existence of the second contract is established by sufficient evidence, the first must give way. It cannot be doubted that by a written agreement the parties to the present suit might have nullified the provision for the need of a particular kind of acceptance of each risk, and might have thus agreed that every shipment by a seaworthy vessel would be accepted upon notice, the risk to begin from the day of sailing; and I think it is equally clear that the parties to the contract might so act that no other inference than such a change in the agreement can be properly drawn. Change by the concurrent acts of the parties to a contract is very different from an attempt by one party to change a term by setting up an inconsistent parol agreement that is denied by the other party. A familiar rule of evidence forbids success to such an attempt; but the rule does not apply if both parties agree that a particular course of dealing has been followed for years, and where such dealing has been wholly inconsistent with a certain provision of the written contract. After such a provision has been disregarded, and a new term has been put into the agreement by the long-continued and deliberate acts of the parties, it would be most inequitable to permit one of the parties, as the respondent now asks to be permitted, suddenly to recur to the superseded provision, and insist upon its present validity. No previous notice of an intention to change the established method of transacting the business was given, and it is certain that no attempt would now be made to change it if the respondent was not to be advantaged thereby.

In my opinion, this is the whole case. For many years, with one or two exceptions, the respondent has treated the libelant's outward-bound shipments of which the respondent had notice as covered by the policy, not merely from the time when notice was received, but from the time when the voyage began. Premiums to a large amount have been paid and received upon this understanding, and, as long as no losses occurred, the respondent was content that the practice should continue; but, as soon as a loss of significant size happens, then for

the first time the disregarded provision is appealed to that requires an acceptance of each particular risk before the respondent's liability shall attach. I cannot believe that this appeal should be sustained. In my opinion, the respondent was bound by its course of dealing to accept the risk in controversy. The risk was precisely the same as in hundreds of other instances that had been accepted without question. The goods were like those that had been previously shipped; the vessel was a first-class ocean steamship; the ports of departure and arrival were within the policy; the rate of premium was agreed upon; and nothing remained to be done except notice to the respondent, and the formal acceptance that had never yet been withheld. As it seems to me, the libelant had acquired a right to rely upon the respondent's acceptance of every such risk as this, and the respondent had disabled itself from refusal. It could not suddenly depart from the unbroken custom that had been so long established, without previous notice of its intention so to do.

My conclusion is, to use the words of libelant's counsel:

"The written policy was not, at the time of this loss, the actual contract between the parties. The real contract, as is evidenced by a course of dealing established for many years, did not require acceptance, fixing of premiums, and indorsement of each special risk as a condition precedent to insurance, but was similar to an ordinary open policy, by which all of libelant's foreign shipments of the class subject to insurance were insured at a fixed rate, subject to the requirement that such shipments should be reported to the insurance company in the regular course of business for subsequent indorsement on the pass book, and computation and collection of the premiums due thereon. In other words, premiums had been agreed upon, acceptance was waived, and indorsement had become a condition subsequent."

It was also argued that, even if acceptance were necessary, the risk had actually been approved, and had been notified to the reinsurer for protection under the policy of reinsurance. I express no opinion upon this point, however, inasmuch as the decision of the other question establishes in this court the respondent's liability. But, if this decision should be wrong, it will then be worth considering whether the respondent may not have gone too far in the attempt to occupy an inconsistent position in seeking, upon the one hand, to reinsure a risk as if it had been accepted, while, upon the other hand, acceptance of the risk was being denied.

In my opinion, the libelant is entitled to recover the value of the goods shipped upon La Bourgogne, and, if the parties cannot agree upon the amount of the decree, a commissioner will be appointed.